May it please the Court. My name is Michael Tankersley and I represent the petitioners in this petition for review. This petition concerns a review of amendments to Federal Motor Vehicle Standard No. 208, which is a performance standard that has the effect of requiring automobile manufacturers to install airbags in passenger vehicles. Congress directed the Secretary of Transportation to amend this standard, and I'm quoting from the statute here, to improve occupant protection for occupants of different sizes, belted and unbelted, while minimizing the risk to infants, children, and other occupants from injuries caused by airbags. The dispute here centers on three points in which we believe the respondents mischaracterized both the rule and the record in this case, and I want to focus my comments today on those three points, which are the following. First, this rule does not improve occupant protection for the population that is modeled by the 50th percentile male dummy, which is the principal one. Well, you know, before you start arguing the merits, there is an issue about whether or not this petition is in the right court, right? Yes, Your Honor. The government has raised both jurisdiction and venue, and we have addressed that in a set of motions that was filed earlier and then denied without prejudice by the appellate commissioner, and also in the main briefs. Our position on that, I think, is very simple, which is, with respect to the jurisdictional arguments, similar language was addressed by both the Eleventh Circuit and the D.C. Circuit, the language being statutes that require the computation of the time for seeking and filing a petition from the date of issue. Both those courts concluded that publication was the appropriate starting point. And no court ---- Publication in the Federal Register? Yes. And no court has endorsed the position which the government argues here, which is all the decisions that you look at contemplate that the time will not begin to run until the agency has completed its final action and released the decision in such a way that it's irrevocable, whether that is by publication or by mailing. The government's position here is contrary to those cases, because they are seeking a rule which would say even before publication or, and in this case, even before any other form of notice, they would have the ability to set the date at an earlier time, and that is not supported by any case. With respect to the venue, we rely ---- Before you get to venue, let me just ask you. Well, I'm sure the government is going to raise this. Go ahead. I'll take this up with you. Save some time, and we'll be back up here on this issue again. Let's ---- All right. Your Honor. The questions really go to the government. With respect to venue ---- We don't want to tip them off here. Right. With respect to venue, we've cited to the ICC v. Brotherhood of Locomotive Engineers case, which is a Supreme Court case which describes the Federal common law with respect to what the consequence of filing of a motion for reconsideration is on the time for seeking review of an agency order. And that decision identifies two things which are applicable here that indicate that the time is told. The first is that a timely motion for reconsideration tolls the finality of the decision. And the second being when the agency actually opens up a prior order, takes new evidence on it, and reconsiders it even without amending it, that starts a new time for petitioning for review of that order. If you look at the order that was issued here by the agency a year and a half after the May interim rule, that is an order that under both of those rules, we believe, opened up the time and meant that the petitioners here were eligible to file their petition for review from the date of the December order, not the date of the May order. The government's principal argument is that they want to create a new limitation which is not supported by any statute, which would be that only parties who participated in the reconsideration proceedings would be permitted to file for review. That is inconsistent with the language of the statute here, which provides for any party agreed to file for judicial review. They have a regulation on it, right? They do have a regulation on it, Your Honor. And their regulation purports to be an articulation of their reading of the case law. If you look at the case law that they cite, both at the time that they adopted this regulation in 1995 and in their brief, none of those cases support their claim for two reasons, one being that none of those cases hold that a party has to, may not wait until the petition for reconsideration is decided, and then file their petition for review on the basis of that. And secondly, those cases all involve either the Hobbs Act or analogous statutes that limit review to the party, to parties to the regulatory proceedings. Under this statute, the petition for ability to petition for review is open to any person aggrieved. And the Supreme Court, this Court, the D.C. Circuit and other courts have all uniformly recognized that the party aggrieved language is narrower than the person aggrieved language, which we have here. Well, is that the kind of regulation that has to be challenged, you know, when it's proposed and adopted or subsequent challenges barred? No. That regulation is not subject to that type of Hobbs Act requirement. Why not? Well, there is no statutory requirement that would impose that. And moreover, our view would be it's not an authorized regulation at all. There's nothing in any of the organic statutes for the Secretary of Transportation that authorizes him to issue regulations to govern the availability of judicial review from various orders. That regulation at best, we think, is an advisory one that is only as persuasive as the paper it's written on. And under the Supreme Court's decision in Mead, because there is no authority delegated to the Secretary of Transportation to decide these issues, it's also not entitled to any special deference. Indeed, if the other thing that we think is compelling evidence for our position here is if you read the 1995 regulation, in 1995, the Department had a regulation that said any party who is aggrieved by the denial of the reconsideration petition can seek review, which is the view that we take here. The Secretary changed that position and adopted this regulation not because the Department concluded it was a better rule, but because their reading of the case law was that that was the rule the courts had adopted and they didn't want a misleading regulation on their books. Our view is that they've misread those cases. And indeed, if you read them, none of them articulate the rule that they adopted. The correct rule is the one that existed pre-1995. And there is nothing in terms of the agency's discretion or any statutory authority that gives them the ability to change that rule that's simply wrong on the law here. Let me return to the three points on the merits that I want to stress today. The first is that the rule does not improve occupant protection for the population that's modeled by the 50th percentile male dummy. The second is the rule does not improve overall safety, even if you look to the tests that model the protection for other groups covered by this rule. And the third is that the technology to comply with the 30-mile-per-hour standard as opposed to a 25-mile-per-hour standard for the unbelted 50th percentile male dummy already exists today. And the government's arguments in the brief that this is the rule is based on the fact that the technology does not exist are not consistent with the agency's reasoning and not consistent with the record. Before I get to those, let me just briefly underscore why it is everybody is focused on this particular test for the unbelted 50th percentile male dummy. NHTSA in its rule itself acknowledges that this unbelted test is really the defining test in terms of the protectiveness of airbag and high-speed collisions. The reason for that is that vehicles can pass a belted test even without an airbag, but about 50 percent of the fatalities that occur in automobile accidents occur with unbelted occupants. It is the 50th percentile male unbelted test that determines the protectiveness of airbag for most people in those crashes. A 50th percentile male dummy models the dimensions of someone who is about 5'9 and 172 pounds. And when NHTSA looks at the accidents, automobile fatalities that are reported to it and tries to determine which of the tests it uses model the protectiveness of an airbag in those fatalities, about 78 percent of the total fatalities are modeled by the 50th percentile male dummy. The 5 mile per hour change in speed that we're fighting over here is much bigger than it appears on its face because in terms of the protectiveness in a crash, it is not just a 20 percent increase in the speed. It is a 44 percent increase in the energy protection or the energy of the crash that has to be dissipated by the airbag or other protective measures in the vehicle. So there's a significant difference in terms of the ability of the airbag to protect individuals and the ability of the vehicle to sustain a crash. With that in mind, the first point that I want to make is most significant, which is that there is no improvement in the protection for 50th percentile males by virtue of this rule. The vast majority of model year 1998 and 99 vehicles, which were tested, perform at a level that allows them to pass at a 30 mile per hour barrier test with an unbelted 50th percentile male. And the Secretary's rule lowers that test to 25 miles per hour. That results in less protection, and this is dramatically illustrated by the chart that is placed in the final economic analysis promulgated by the agency with the interim rule, which appears at page 223 of the government's supplemental record excerpts. This chart illustrates the agency's own estimates of the consequences of various tests, and the baseline for this test is the performance of model year vehicles that existed prior to 1998. Because the agency found that vehicles already could meet a 30 mile per hour test, for the 50th percentile male, they didn't attribute any increase in protection from adopting that type of test. However, they concluded that by adopting a 25 mile per hour test, this would permit manufacturers to degrade the existing protection to such a degree that if they took full advantage of the rule, there would be an additional 394 fatalities as a result of the decrease in the protection of the airbag for that population. That is the reason that we say that this is not a test that — not a rule that improves automobile safety, and indeed, NHTSA's own statements about it echo that. The only way that they can claim that there is any improvement here is to make two claims. The first is that the baseline should be a test that they never adopted but rejected, which is the 25 mile per hour sled test. The only way — essentially their claim is that this is an improvement because this test is less bad than a worse test that we could have opted for, which is the 25 mile per hour sled test. The second thing that comes through in the statements with respect to the notice is that the agency is relying on the manufacturers to voluntarily not take advantage of the rule and degrade protection, but instead improve it. That is contrary to the statute, which says that this is a rule that is required by — the Secretary is directed by regulation to come up with a standard that improves protection. My second point is that the overall safety of the rule, even if looked at in terms of the other population groups, is also not improved here. And the reason this is relevant is that although the statute talks about two goals, improving occupant protection and minimizing the risks, and we believe the fact that it does not improve protection for the 50th percentile group alone establishes that it's unlawful, we also think it's arbitrary and capricious because the agency's stated reason is that there's an overall benefit to safety by virtue of having lowered — chosen the 25 mile per hour standard instead of 30 miles per hour. If you look again at the chart that appears at page 223, you see that that is not the case because of the importance of the 50th percentile test in terms of the fatalities that occur in the real world. The results in fatalities that can occur from crashes from lowering that test overwhelm and swamp all the protective benefits from the other aspects of the rule, which are directed towards smaller populations, children, small adults, and infants. In particular, there's no way to rationalize this rule as a tradeoff that results in a net benefit to safety. Instead, because of the importance of this particular test and the fact that fatalities and injuries from airbag occurrences were already lowered by 1998 and by 2000 when the agency issued this rule, this is a rule that results even under the agency's own estimates in a net decrease in the protection. The third point is that this is not a rule that is based on a problem with technology. The agency's rationale here is not and would not be supported if the rationale was that the technology does not exist and it's not feasible. And to understand that, you need to look at the principal tradeoff that the manufacturers presented in the course of the rulemaking and that the agency studied. From the beginning, NHTSA was faced with the claim that there would be a tradeoff between passing the test for fifth percentile female dummies and meeting a test for 50th percentile dummies, an unbelted test, which is to say that the manufacturers claim that if the test was set at 30 miles per hour, it would be difficult, more difficult for them to meet the test for fifth percentile female dummies. When NHTSA did the test on this, however, they found that not only did most vehicles pass the 30-mile-per-hour test, vehicles also passed the 25-mile-per-hour test with female dummies. And this is explicitly described in the final economic analysis, which appears in our further record excerpts under Section 7, page 17, where the agency discussed the fact that they tested four vehicles that had passed the other test against the 25-mile-per-hour standard with the fifth percentile females. Three of them passed all of the tests. One of them passed one of the — failed one of the passenger tests. And the agency's conclusion was that all vehicles could meet both tests with minor changes. No remarkable changes, only the existing technology was necessary to meet that. In the draft rule, which we've also submitted with the record, the agency went on at some length about the fact that the manufacturers' claims that technology did not exist to meet these tests were not borne out by the test that it did and its analysis of the record. In the final rule, the agency did not repudiate those claims. They put them in a footnote or buried them in more obscure parts of the record. And in particular, in the final — in the final economic analysis, which is included in the further record excerpts at page B-5, they discuss their analysis of this, describe the number of vehicles that passed various tests, and in the end say it's clear from this that the existing technology in vehicles allows manufacturers to meet these various tests. One final point on this is that multilevel inflation, which is what is often described as advanced airbag technology, is a technology that already exists. In the government's brief at page 35, they recite the statement, current airbags are not advanced because they do not respond to factors such as crash severity, occupant weight, and occupant location. That statement is only true if current airbags is defined as limited to what was available in model year 1998. By model year 1999, Honda was introducing airbags with that, and in model year 2000, many manufacturers were. And in the final rule at page 3744, the agency went on at length describing just in model year 2000 how many vehicles were being introduced with these technologies. Those technologies have continued to grow, and all of these technologies necessary to meet this rule are extant in existing airbags. There is no justification for the agency's decision to essentially let manufacturers introduce airbags without advanced technologies by allowing them to not only not continue to meet the existing level of performance that they found in model year 1999, but to degrade that level of performance. Thank you. Thank you. Actually, you've used up your time, but we'll give you two minutes for rebuttal. All right. Thank you. May it please the Court, I'm Thomas Byron from the Department of Justice. I'm here on behalf of the Respondent, Secretary of Transportation. With me at Council tables, Jennifer Timian, Staff Counsel for NHTSA, and also Counsel for Interveners, Erica Jones. I'd like to reserve some of my time for Ms. Jones to present five minutes of argument on behalf of the interveners in this case. Great. Wonderful. Thank you. Obviously, we want to talk about whether the petition was timely and whether it's in the proper court. Right, Judge Pius. I'd like to talk about that, too, because both of those questions must be resolved by this Court before reaching the merits. That's right, under Steele Company. Let's start with whether issued means issued or whether instead it means published. And it seems to me that Congress knows the difference and has established the difference when it chooses the trigger date in various different statutes. Some say published. Some say when notice is received. Some say, as this one does, when issued. Now, to be sure, there are some cases, such as the Eleventh Circuit Florida manufactured housing case, that say in regard to particular statutory schemes where there is an absence of the kind of elucidation in the regulatory materials that we've got here because the agency had not told us what they think is the trigger date, that in those cases the courts took it upon themselves to try to determine when to begin running the period to file a petition for review. In this case, there's no need to do that for two reasons. First of all, there's no ambiguity. Issued is the word used in the statute. Issued on is the word used on the face of the order itself. There's no doubt that that means the same thing. It's the same word. The second reason you have to say that Congress intended for a petitioner to have 59 days. Well, but 59 days from what? I think that begs the question. Well, as I understand, maybe you just need to go through the process here for me to help me understand what happens. Issued. Yes. You look on, is that the day that the Secretary signed it? That's the date. Is that the day that it was sent over to the office of OMB? Is that the day that it was forwarded to the office of the register? Let me walk through the dates because I think that may help answer some of those questions. The date that the order says it was issued on is the date that final approval was given by the agency decision-maker. In this case, the December 6, 2001 date is the date that it was signed off by Dr. Rungi, the administrator. How do we know that? How would a, you know, some citizen out there, whatever, how would you know that? Well, one way you'd know that is by looking at the 1995 rulemaking that addressed, primarily addressed the second question about venue. But it also said that issued is the date that triggers it. Now, it didn't go into the kind of detail that we're going into today, but it wasn't necessary because it was clearly articulated by the agency as both the D.C. Circuit in Adams and this Court in California Association for Physical Handicap directed the agency to do to try to resolve these kinds of inconsistencies. There was no doubt that the agency viewed the trigger date as the date that was indicated as issued on. Now, you're asking, I think, how would somebody know what that date means? Well, frankly, I'm not sure how relevant that is. We can tell you that. I can provide you an after-date from the relevant agency decision-maker. Go on. Congress has said they have 59 days from the date it is issued. But here, they don't give 59 days. Well, sure they did. Did the Secretary issue it and keep it in his office until the 58th day? No. Why not? But that's not what happened. Well, why can't he do that under your jurisdiction? Because that's not the normal course of the proceedings. First of all, the APA requires that people go. It's not normal course. Your argument about the meaning of the words in the statute. Yes, that's right, Justice. Under your argument of what the word means, he could keep it in his office until the 58th day and then, you know, make it public on the 59th. I don't think that's right, Justice Kennedy. I don't think it's right either. But under your statute, that's exactly it. He could do it. No, I don't think the statutes allow that. Because remember, it's not just this statute that governs that question. It's also the APA, which requires publication. Now, publication, and let me get back to the timeline that Judge Hyatt was asking about. Publication here took place promptly. It was sent the next day, December 7th, to the Office of the Federal Register. And again, you might ask, how do you know that? Well, you know that because that's what the agency tells me. And I can provide an affidavit if the Court is truly concerned about the accuracy and good faith of those matters. But there's no reason to be concerned about those here. Neither have they been challenged, nor is there any reason to doubt them in this case. The fact is, the Federal Register is here. Let me ask you that. Was it the agency action, or is it final at that point? It's final on the 6th, yes. Could it be called back? Depends on what you mean by could it. For the purposes of asking, it had not yet been published. Right. And it wasn't published on the 7th, so I'm asking. So on the 8th, could the Secretary have said, wait a minute. Wait a minute. I've changed my mind. Right. We've got to change something here. Bring it back. I want it back. According to the Petitioners' point out that the office of the Federal Register has its own regulations, and that those regulations allow it to be recalled before publication. That's true. That doesn't affect, however, the finality for purposes of determining whether it's reviewable. And the cases that arose during the period when there was a race to the courthouse for purposes of determining venue, now, that doesn't happen anymore. But there's a whole lot of cases that we cite in our brief that arose under that scheme. And those cases talk about deferring to the agency's expressed articulated view of when the trigger date is. Now, those were often artificial, necessarily because you just had to have certainty. Right. So in those cases, sometimes they said 3 p.m. the day following is the date. So things that were premature weren't counted. Here, it seems to me that the point is that for purposes of reviewability And that's what those cases are about, after all. It doesn't matter whether the office of the Federal Register allows it to be recalled. It matters whether a petition for review filed on the 8th would be within the Court's jurisdiction. And our view is that it is. Not just – it's not just our view today. This is a view that the agency articulated in 1995, doing precisely what this Court and the D.C. Circuit and other courts have called on the agency to do, which is to relieve the relevant concerned parties of any uncertainty about when the date starts. This is not something that we just came up with today. This is something that everybody has known about for a long time. Indeed, as we pointed out in our motion, this is something that public citizen representing the Center for Auto Safety knew about some 20 years ago, because they filed a late petition for review that would have been timely under this – under their argument today. And it was dismissed by the D.C. Circuit. There's no opinion. It was just dismissed on that ground. We attached it to our motion. This is – this is, frankly, I think, an error that they're now trying to come up with a post-honk rationalization to overcome. There's no doubt that everybody knew issued means issued. And there's no reason to go through any great convoluted argument to try to overcome that now, especially because these particular parties, Public Citizen and Center for Auto Safety, knew about this a long time ago. Let me turn to venue. I'm sorry, Judge. Let's assume now that Public Citizen can post-honk their way out of this. So we get to the second barrier, which is this who petitions reconsideration, right? Yes. Can you address that for a minute? Yes. That question goes to whether the other four Petitioners, those who didn't petition for reconsideration at the agency level, are entitled to bring a petition after the denial of Public Citizen's and Center for Auto Safety's reconsideration petition. Remember, that petition was denied. They make a great deal of the fact that other petitions, ones raised in part by the industry seeking clarification and change to some of the technical things, those were granted in part. But that doesn't matter. They're not trying to seek review of the issues on which reconsideration was granted. They don't get any benefit from that. The scheme is pretty clear. And let me back up for a minute and talk about the evolution of the cases, cases such as ICG Concerned Workers and the Untransportation Union and those cases that talk about the party-based nature of finality. And that was important in the last 15, 20 years, especially because what was happening was you'd get multiple parties involved before an agency. Some of them would petition for reconsideration at the agency level. Others wanted to go straight to court. And there was some question at the time, 15, 20 years ago, indeed, as little as 10 years ago, whether those who decided not to go back to the agency were entitled to go straight to court. The courts have unanimously held that if you don't want to go back to the agency, you get to go to court. Your 59 days in this context starts to run as soon as the order becomes final and reviewable, even if somebody else is raising precisely the same issues before the agency in a petition for reconsideration. That's important because you don't get two 59-day windows to file a petition for review. You only get one. It's a jurisdictional period that limits the authority of this court. Without complying with it, they are out of luck. They didn't seek review during the relevant 59-day period that it seems to me the Petitioners have not disputed, that the four California Petitioners could have come to this Court in May of 2000, any time between May and July of the year 2000. They didn't do so. Their 59-day window has expired. It doesn't matter that they're a person instead of a party, because we're talking – I'm sorry?  What's the best case that supports that position? I think it's ICG Concerned Workers and Bell South and the D.C. Circuit, because those cases do what I just explained. They say that if you want to seek judicial review when somebody else is still back before the agency, you can. And once that's established, this Court would have to say that they are precluded from coming to court within that immediate period, as long as some petition for reconsideration is before the agency. That would be an extraordinarily – an extraordinary break with the unanimity of the other circuits that have considered that question. The alternative would be to say that the 59-day period – that you get more than one 59-day period, and there's no basis for that either. Now, the Petitioners have just ignored those concerns. They haven't addressed them in either their opening or their reply briefs. But I think they are essential to the resolution of this question. How about this regulation that's promulgated, 553.39? Yeah. Judge Feist, I think the regulation is useful not because it's entitled to Chevron deference or because it's binding on this Court, but because it correctly analyzes the case law at the time, and because it resolves any uncertainty and puts all relevant concerned parties on notice, that this is how the scheme works. The argument here on the other side is just ignore that regulation. It's an incorrect interpretation. It seems to me, Judge Feist, they've done so at their peril, and that, you know, if, for example, the kind of deference that it's entitled to is Skidmore deference. It's entitled deference because it's correct and persuasive, right, and it correctly analyzes these things. And it's also entitled to deference because it does what this Court has said agencies should do, which is resolve that uncertainty. Now, the question then becomes, well, what if the agency was wrong? Well, if they were wrong and it's not persuasive, then there's some question whether you can overcome the Skidmore deference. Maybe so, but I haven't heard an argument that they are wrong because they haven't addressed those two essential points, which is that the four California Petitioners could have come here in May 2000 and chose not to, and that the 59-day period is jurisdictional and you only get one. Now, that's not to say, and this is where the person aggrieved comes in, that if the agency had granted reconsideration in December of 2001, in fact, the agency did, to change some of the test criteria at the request of some of the industry members. If they had actually been persons aggrieved by that decision, they could have come to court again. Then they would get a new period, because that's a new decision, of course. No surprise there. Now, when I look back at the Brotherhood of Locomotive Engineers, I was particularly surprised that Petitioners tried to take advantage of that case, because it actually refutes their very argument. It says you cannot start the clock again just by asking for reconsideration, especially when reconsideration is denied, as it was here in relevant part. I'd like to turn briefly, before I eat up too much of intervener's time to the merits, unless the Court has any further questions on the jurisdictional concerns that we've raised. And I'd like to emphasize, first of all, that the — this case is not just about — and this rulemaking is not just about a single test. This is a comprehensive reworking of a very complicated and difficult safety standard that has been subject to lots of fluctuations. It's important to bear in mind, too, why these most recent fluctuations have come about. It's because after 93, when all light vehicles had to have airbags in them, people suddenly discovered that airbags, though they saved many lives, can take others, and they take the lives of children and smaller adults, and those are people that the public and the politicians and Congress and the Administration were rightly very concerned about, and they wanted to address those problems. So T21, the statute here, told NHTSA to do two things, not one at the expense of the other, but both. It must improve occupant safety at the same time that it ensures risk minimization for those populations. That's a delicate balance, and the agency is constantly concerned about the effect of a change in one area on other areas of this very complicated, comprehensive safety standard, so that if you increase the speed of the unbelted barrier crash test, what effect is that going to have on the ability to accomplish the risk minimization requirements? That's the principal concern that underlies the decision not to go to 30 instead of 25. And I want to address for a moment, too, the repeated invocation of this notion that there was a lowering of the speed from 30 to 25. Not so. There was an increase in the effective speed from 22, which is the effective speed of the sled test run at 30 miles an hour, by the way, not 25, as Mr. Tanklesley mistakenly said earlier today. That's an increase. It's not a lowering. The sled test was in effect. And it's not just that it was in effect. Congress had specifically required that it remain in effect. And it had given the agency the option of keeping it in effect under the new rule. I see I'm into intervener's time. If I may just make a few comments, I hope you'll grant her a little bit of leeway. And this goes as well to the concern that the agency had that they wanted the manufacturers to get it right the first time because of the public acceptability concerns that arose from the earlier incident. There were — there was a large portion of the public that didn't believe these safety devices worked, and they believed that they actually put children at risk. And the agency rightly wanted to overcome that in this second phase, this advanced airbag thing, as of the regulation. And so in the end, this comes down to the agency's expert judgment about the technology involved here and the ability of the manufacturers to comply with interrelated requirements. And Petitioners say today that, gee, the technology's already out there. They can do it. The agency made the expert judgment that that is not so, that that's not true. And the agency said, look, we're worried that if we make you strive harder, in other words, we're giving you some occupant protection for everybody, the way we've developed this rule. One is in injury criteria, which are tightened. Another one is in the addition of new tests. And another one is in the — I'm sorry if I can pull back my list — in the change from the SLED test to the 25. That's a real improvement on all three scores. Now, we've done that. So the question then is, do we have to do more improvement to occupant protection? And they said no, because requiring more improvement then would make it too difficult to do risk minimization. And we think we don't want to sacrifice risk minimization. We want to accomplish both. And so we want them to focus first on risk minimization. So if the Court has no questions for me on the merits, I would like to leave a little bit of time for the interveners. And I just emphasize that this really is a case about Chevron deference to the agency's reasoned interpretation that the SLED test is the proper baseline and to the agency's — and APA review, arbitrary and capricious review of the agency's reasoned articulation of the decision to go to 25 instead of going all the way to 30. Thank you. And we urge the petition be denied or dismissed. All right. Thank you. Good afternoon. I'm Erica Jones, and I represent the Alliance of Automobile Manufacturers and the Automotive Occupant Restraints Council. I'll try not to repeat my co-counsel's points here. I'd like to start with a reference to the State Farm decision, the Supreme Court's review of a predecessor to this regulation nearly 20 years ago. The Court said there that if Congress established a presumption, it is against changes in current policy that are not justified by the rulemaking record. This Court in 1978 established an even higher bar in reviewing another NHTSA regulation and throwing it out because it was unjustified and held there that the agency has a heavy responsibility to assure that its regulations do not produce a more dangerous highway environment, and that's Packard v. NHTSA from 1978. Here we are talking about a dangerous highway environment for small children and small adults that NHTSA responded to in 1997 with a change to the regulation to set what we call the sled test, the equivalent of a 22-mile-per-hour barrier test. That is the current policy that State Farm councils must stay in place absent complete and powerful justification to change. And that is what NHTSA reviewed and decided to change to improve to go from a 22-mile-an-hour barrier equivalent to a 25-mile-an-hour barrier. Petitioners would have the agency return to 30. Thirty is the level at which the previous airbags were found to have been dangerous to children, to small adults. The agency found that 158 individuals had been killed by 30-mile-an-hour certified airbags by the time of the issuance of this regulation. It was not unreasonable for the agency to conclude that the industry's task in meeting this very complex new rule should focus on protecting that population at risk and look in the longer term at other ways to improve protection to other populations. In our brief, the intervener's brief at page 23, we provided a graphic chart trying to illustrate the complexity of this new regulation compared to the task that was at hand in the prior regulation. These are the certification tasks that the agency asked of the industry before the new rule. These are the certification tasks of the new rule. Every cell in this chart is a separate requirement for compliance. And a failure of any one of those cells requires the industry, the manufacturer who fails it, to stop sale of that vehicle immediately, recall the vehicles that don't comply, and face $5,000 a day civil penalty for each vehicle that doesn't comply. This is not a theoretical or an average or even a tolerance of 5% failure. It is a 100% compliance requirement. It was not unreasonable for the agency to ask the industry and to order the industry to focus on protecting the population that was most at risk in the prior version of the regulation. Thank you. Thank you. I just have one point to make on the merits, and I'll turn to the procedural arguments. The arguments that you've heard this morning would be fine if what the agency had done here is say, we are only going to require minimal improvement with respect to the test for 50th percentile males or the other crash tests, because during the period that we're trying to implement the risk minimization requirements. That is not what the agency did, most emphatically. What the agency did instead is say, during the period that we're implementing the risk minimization requirements, which go through 2006, we will allow manufacturers to degrade the performance that currently exists in vehicles and current is model year 1999, four years ago. That is inconsistent with the statutory mandate. Moreover, the agency said even during the next phasing period, through 2010, we are not going to we're going to continue to allow the degradation to go down that is authorized by the rule. So between model year 1999 and 2010, which is the horizon of this rule, you're looking at degradation of the protection that is afforded to the largest population that is protected by this rule. On the jurisdictional point, there are two problems with Mr. Byron's argument. The first is that, as he acknowledges, agency action can be called back once it's been sent to the Federal Register. The second is the regulation here does not say the time will run from the date that the Commissioner signs it or from the date that we put on it on the notice as being the issue date. It says it shall run from the final action. The final action with respect to any rule that's being published in the Federal Register is publication in the Federal Register because that's the point at which the agency can no longer recall it and bring it back. With respect to venue, Mr. Byron makes a number of claims about the existing law, all of which are incorrect. First, he says there's no more than one 59-day window. There is no such case that holds that. He says that it is – it follows from the cases that hold that those who do not want to go back to the agency are entitled to go to court, that you must go to court if you don't file for reconsideration. There is no case that holds that. What the cases do hold is that the time for seeking to challenge an order is told by a petition for reconsideration. And then the Supreme Court and other courts have gone on to say, by virtue of special language in the Hobbs Act and some other statutes that make clear that Congress did not want to preclude people from seeking review if they chose not to seek reconsideration. That particular statutory language requires courts to entertain those petitions for review. There is no statute and no case that holds that a petition for reconsideration does not hold the time for everyone who hopes that the petition for reconsideration is granted and thinks that it would be foolish to file a petition challenging a rule that the agency is actively reconsidering. Thank you. All right. Thank you. We thank all counsel. This case is now submitted for decision. And the panel will now adjourn for the day. All right.
judges: Reavley , Tashima, Paez